The next case on our docket is 23-1292 Vogel v. Boris and Keith. Good morning, your honors. May it please the court, Eric Silvestri on behalf of a plaintiff appellant Stephen Vogel. Your honors, this case perfectly captures the wisdom and need for Delaware's parole evidence rule and how, if cast aside, straightforward issues of contract interpretation become sprawling, unclear, and unnecessary legal archeology. If the district courts and the defendants' analysis of Delaware's parole evidence rule were the law, dockets would be filled with parties like defendants who, despite clear contract terms, would stack piles of emails, draft agreements, phone records, anything they could get their hands on except the terms of the agreement because they want out of that agreement, but not because those terms are unclear. Can I focus on that? I'm oddly sympathetic to the view that the plain language of this agreement may well cover it, but I'm not entirely sure it rolls in the direction you're arguing. So I want to ask you a little bit about the plain language. 702 itself has two subsections, and the first subsection specifically limits the member or manager's obligation as to business opportunities from the time of the signing of the agreement until the earlier of the dissolution and liquidation of the SPAC, basically the closing of the business combination. Given that fact and given Section 11, which essentially has the entire agreement dissolving on the liquidation of the sponsor, isn't it actually more reasonable to read this agreement as providing that the obligations under the agreement terminate on the liquidation of the sponsor? Okay, so I want to tackle your question, Your Honor, in several parts. The first thing I would say is that I agree with you that it is informative to the interpretation of the operating agreement that Section 7.02A, and I've got it in front of me here and Your Honor is exactly right, does contain a durational limit that extends to, and I'm quoting the operating agreement here, the dissolution and liquidation of FMC or the closing of the business combination. So the first thing I want to point out, it's related to Your Honor's point, and I promise I will address Your Honor's point directly, is that the operating agreement in that language that Your Honor focused on treats the liquidation and dissolution as different than a business combination, and that's going to come up later on Your Honor's point regarding when this agreement terminates. But to my main point about why is that important, Section 7.02A's durational limit, it doesn't appear in Section 7.02B. And so what the parties clearly did, as judged appropriately by the four corners of the agreement under Delaware's Parole Evidence Rule, is they included a limit with one limitation in Section 7.02A, and they didn't in Section 7.02B. Okay, so you view the omission of 7.02 as an indication that there wasn't an intent that that temporal limitation applied through the whole section? Fair enough. That's exactly right. What do you do with Section 11.01 then? Okay. Thank you, Your Honor, because I think that's the next logical step. So let's talk about when this operating agreement terminates. Important to recognize is that we have two operating agreements. One is the focus of this case, which is the operating agreement of foreign capital management, which I've got in front of me now. And then there's the operating agreement of the sponsor. So above the sponsor, and I recognize this is covered in the briefing, but I think it helps set the stage for what we're talking about. The parties in this case purposely placed the management company above the sponsor, which is not a traditional way to organize this type of deal. Normally it's just the sponsor. It ends and then everyone goes their separate ways. So given that fact, let's take a look at when the operating agreement for foreign capital management, the primary operating agreement in this case, terminates. Terminates upon the completion of four conditions. And I just want to skip right to where Your Honor focused, which is 11.01 subsection C. The liquidation of the sponsor unless agreed in writing by all managers. Okay. So it terminates upon the liquidation of the sponsor. What does that mean? Liquidation in the SPAT context, as we pointed out in the papers, means something different than a business combination. And that is in keeping with how the rest of this agreement treats business combination, if we could briefly move back to 7.02A, as different than dissolution and liquidation. Can I push back on that a little? I understand what liquidation means normally in the SPAT context, but when you then go to the sponsor operating agreement and you look at 9.01 and you say events causing dissolution, and it says the sale, disposition, or distribution of all securities held by the company, which would be what would happen in the context of a business combination. Well, you might say, well, that's dissolution, not liquidation. But then the next subsection says distributions upon liquidation. And the very first thing it says is upon dissolution of the company. And then it describes the liquidation process, which seems to suggest that for purposes of the parties, they did understand liquidation and dissolution to be somewhat interchangeable and to key on the closure, one way or the other, of the SPAT. I think, Your Honor, Your Honor's point is well taken, that liquidation and dissolution, I wouldn't say they're interchangeable, because they use the two terms differently. And so I think normal principles of contract interpretation. But one automatically follows the other. No, Your Honor, I don't agree. I agree. Liquidation does not automatically follow dissolution under that agreement we just looked at? The distribution of assets of the sponsor results in a, the sponsor agreement says that it shall be wound up and terminated. Upon dissolution, appoint a liquidator. So upon dissolution, we go to liquidation, right? I think those terms are treated differently, Your Honor. They're different, but they're sequential. No, not necessarily. I think in the SPAT, and this is where the context of the SPAC industry is helpful, as we pointed out, liquidation is when a SPAC fails. Wait a minute. You're talking about the SPAC industry? Is that extrinsic? An excellent question, Your Honor. Note, Delaware law does not treat industry gloss as extrinsic evidence. But all of this, I mean, you have your interpretation. It's been suggested that maybe the other side's interpretation is better. It seems to me, at a minimum, that creates ambiguity. There are different ways of reading this. It seems to me, even on the face of it, it's a little bit peculiar in an agreement that is otherwise very focused on creating a SPAC and getting a project underway and talks in 702A about when that's all going to end, that a section that then reads in total isolation as if it has no time limit and these people are being bound together forever unless they unanimously agree to dissolve, where it is limiting anybody from doing anything else on their own ever in history. That seems like a weird way to read that. To me, it seemed when I first read it, I thought, oh, I see what they're doing. They're saying that while we're working on this project, you better not go do something on the outside. That's the way I read it before I even got to any of the extrinsic evidence or anything else. Am I nuts? You don't have to say yes. Why is that not a reasonable way to read the contract taken as a whole? Well, because I think it ignores some of the structure of this agreement. Some of the structure. Others of the structure, as has been pointed out, point the other way. So we've got a lot of contradictory indications, and it seems to me at a minimum the argument that the defendant's advance as a reading of this is sufficiently plausible that it makes sense to consult the extrinsic evidence, which, by the way, includes something your client took when it was in his interest to take that position. So it's a little tough to me to say that this is, you know, just so obvious that the district court should not have looked at the entire context of this and what everybody had to say about it and then make a reasonable judgment accordingly. Let me tackle your Honor's question this way without prejudicing my right to disagree with the interpretation and talk about ambiguity because I think there's a larger point buried in your Honor's question. Let's assume that your Honor is correct. It's ambiguous, and this obligation lasts only as long as up into a business combination. My client should still have won. The earliest this could terminate under your Honor's interpretation that you've put forward and under the district court's interpretation would be upon a business combination. Okay, defendant's breach before that. The protections of this agreement were in place before that. Everyone agrees about that. Even the district court's opinion agrees about that. And so when defendants decide in December 2017, months before the business combination, then take action related to their decision to cut my client out of his own business in December, in January, surely leading up to when they are executing documents in April of 2018, I certainly don't want to say that the ambiguity, no ambiguity question is not important, but it does fall to the side in light of the facts that are undisputed in the record. So could you be clear about that? Because the question here for a breach is you have to actually be performing services for some other SPAC. And on the one hand, I wouldn't take such a formalistic view that that can't happen until there's a SPAC up and running because it takes some time to get one up and running. But it sounds like your argument is two of them deciding between themselves that they want to pursue another SPAC and that they don't want to do it with your client is itself a service to that SPAC. Is that, we have to sort of accept that proposition? It's not the, we are putting that argument forward, and that is because of the inclusion of the phrase directly or indirectly, which we think renders this clause very broad. But let me also say that it is not just the decision to move forward. Right. What are all the acts that happened before, say, February of 2015, or 20, before the combination? So what the record reveals is that in order to do this, the defendants raised capital, they advertised, they put agreements together, they engaged counsel. Sure. And is there evidence that they did that before the business combination of SPAC 1? Absolutely, Your Honor. If you'll permit me a few moments. I recognize I'm over time. May I continue? Yeah, why don't we, you know, rather than taking time, if you need to look for them. Oh, no, I've got them right here. I just need to flip a page over. Sure. So, because I'd like to give you citations directly to the record. Okay. So the record reveals that they engaged counsel before the business combination. That is certainly the first step that they took with regard to FMC 1. Sounds like the first step. If Your Honor is looking for more concrete things than the decision to move forward and the planning to move forward, then that's certainly a concrete step. All right. Engaged counsel. What was the date of that? That took place, the record is, I'll direct you to Joint Appendix 554 and Joint Appendix 1500, and it's got a dual site because those are paragraphs of our undisputed facts on the summary judgment record that are undisputed in defendant's response, and it's specifically paragraphs 134 through 140. And what dates do those have? I believe that's January. That I may need a bit more time to go back and dig up under the undisputed facts, but I would be able to point Your Honor to that. Okay. Be prepared on that. And then let me just ask, I want to play that out a little bit. Let's assume you're right. Let's assume there's some overlap. As I understand the, what I'm going to call the master contract, it's hard. I've tried to do acronyms, but they look a lot alike. So let's say that the Foreign Captable Amendment, let's assume that it was structured in contemplation of the possibility of future SPACs together. Am I right, though, that for any additional SPAC beyond the first one, Foreign Merger Corporation I, the contract required unanimous agreement of all the members to engage in a second SPAC together? No. No, I don't. That's not how I read the contract, Your Honor. I think what the contract does is points the parties to one another as a default position, and then says if you want to do something else, you need each other's permission. But also if you want, are you saying that the contract does not say that in order to enter into a second SPAC, these three people have to unanimously agree to do it? If Your Honor is focusing on a specific provision, I'd be happy to address it, but that is not how we read the agreement, no. Okay. That's helpful. Maybe we can let you find the citation until we get to hear from you again, and we'll, if you want to take a seat, we'll hear from Mr. Hotline. Thank you, Your Honor. Good morning. May it please the Court, my name is Jonathan Hochman, with Schindler, Cohen & Hochman, and I represent Defendant Appellees Marshall Keeve and David Boris. Your Honors, Mr. Vogel's case is both profoundly cynical and completely at war with the fundamental purpose of contract law, which is to effectuate the intent of the parties. His claim is profoundly cynical because here we know exactly what the intent of the parties was, and Mr. Vogel has admitted that that intent is the precise opposite of his interpretation of the contract. As the district court therefore concluded, Mr. Vogel is seeking to garner, quote, the benefit of a bargain he did not get at the negotiating table, unquote. If you could help me, I want to, sorry, to jump in. I understand the notion that the master agreement terminates on completion of the business combination, that's your position, or the obligations under the master agreement. One of the things I'm struggling with a little bit is there are, the business combination is a moment, right? There's a closing.  My assumption is that it takes some time then for the sponsor to sort of complete the steps necessary to fully execute that, to distribute the shares to other people. Does that all happen instantaneous with the business combination, or does that happen over time? The best evidence of it, it happens promptly, I would say, over 10 days, because the sponsor agreement itself that governs when the sponsor dissolves says within 10 days they'll use their best efforts to distribute all the shares within 10 days. I think that's section 402 of the sponsor agreement. I'm mindful of that, but I think that's an aspirational provision, and I wondered if the record tells us when those steps were in fact completed. Was it in fact within 10 days, or were there still loose ends relative to the sponsor in April and May, which could be relevant? I don't have a record site for you. My understanding was that it was right in that time frame around February. So the district court here carefully reviewed the facts in the law and properly found that 702B was both ambiguous and silent with respect to how long it restricted the party's outside SPAC activities. The district court therefore properly examined the extrinsic evidence of the party's intent, and Judge Marrero found that evidence overwhelmingly disproved Mr. Vogel's claim about the party's agreement. The evidence overwhelmingly disproved his claim that the parties had agreed to limit their outside SPAC activities forever, and it overwhelmingly disproved his claim that the parties had agreed to bind themselves to an ongoing business venture with each other also forever. And a striking part of that overwhelming evidence, Your Honors, is made up of Mr. Vogel's own admissions. Mr. Vogel admitted that the parties never agreed to have an ongoing business relationship or even to do a single additional SPAC together. He was also forced to admit at his deposition that he understood that Section 702B was supposed to be time-limited, the very opposite of his claim in this lawsuit. And in fact, he forcefully asserted that very proposition in writing in his December 9, 27 email when, as Judge Lynch said, it benefited him. He said specifically with reference to 702B that he believed, quote, the whole agreement was only governing until a business combination was completed, which the district court found was the best manifestation of Mr. Vogel's actual understanding of what the contract was supposed to provide. And Your Honors, these dispositive admissions are just part of a mountain of evidence, including the course of the parties' dealings and the provisions of the operating agreement itself that led the district court to conclude that overwhelming evidence demonstrates that Section 702B was intended to be time-limited and only remain in effect until the merger was completed. Now, Your Honors, this is not one of those cases where different considerations pull in different directions. Here, everything about this case mandates affirmance. Here's a list. One, the district court properly applied Delaware's parole evidence rule requiring examination of extrinsic evidence where a contractual provision, as here, is either ambiguous or silent. Two, the parties' overwhelmingly established intent that 702B was supposed to end after the merger. Three, the other terms of the contract read as a whole that established that this was a one-deal agreement and there was no agreement to an ongoing relationship. Four, the lack of any purported damages from appellant's purported brief. Five, the own enforceability and commercial unreasonableness of a purported perpetual restrictive covenant that they couldn't do their business, which in Mr. Boris' case, he was a SPAC professional, this is what he did for a living, and the claim is that he bound himself to these two new partners forever and couldn't do his business at all without their permission. And finally, even if the court accepted Mr. Silvestri's and Mr. Vogel's invitation to blind itself to all of that evidence for the purpose of interpreting the contract, it would still need to review that overwhelming evidence of the party's intent in connection with Appellee's reformation claim. Because if the contract were interpreted, you know, Mr. Vogel says it's so clear, if we accepted that it's so clear, well, then it simply doesn't say what it's supposed to say. Because we know what it's supposed to say. There's overwhelming evidence of what the parties really intended, which was that 702B was supposed to be time limited, and that very same evidence that the district court analyzed with such thoroughness provides the grounds for mutual mistake by clear and convincing evidence by a long shot. And that, therefore, even if you accepted all this stuff about the parole evidence rule, which we richly believe you should not, provides an entire alternative ground for affirmance that's already cemented on the record. Now, just to turn to a couple of things that came up in your questioning of Mr. Silvestri. Quickly, we found the site that he was looking for about when services were performed, and the engagement of Elanoff firm was, well, let's see. I don't, sorry. What I have is April 14th was the draft execution of the summary of FMC2, May 2nd preparing to launch the deal. The earliest date there that we see is that April 14th date. Now, interestingly here, the argument that Mr. Vogel actually leads off on, the first argument in their brief is this timing argument that there was a breach even before the February 2018 business combination. And what the breach is purported to have consisted of was two things. One, they said, hey, Mr. Vogel, we don't want to do business with you anymore. And two, sometime in the future, we're going to do another SPAC. This doesn't cut the mustard for four reasons. One, Mr. Vogel likes to say that contract terms have to be interpreted in connection with their ordinary meaning for an ordinary purpose. There's no way that could be interpreted as performing services. The thought that, gee, at some point in the future we may do a SPAC, that's not a service and it can't be interpreted that way. Second, there was no SPAC at that time. FMC2 was not even formed until May 4th, 2018. And as the district court found, a SPAC isn't fully formed until it's IPO, which makes perfect sense. You can start an entity, but say the IPO fails and you don't raise the money. So you're saying that all of the work you do to pull it together and get it launched doesn't, as contemplated by this contract, contemplate services for a SPAC? Yeah. So if during this period when FMC1 was outraising capital and other things, you were off, or anybody was off, he was off setting up a second SPAC but didn't yet incorporate it, you would say that wouldn't run afoul of the obligations of the agreement? That it was pre-IPO. I would say yes. Of course, there are two different phases here. There's pre-business combination and post-business combination. And pre-business combination, you have a deal to protect. Once the business combination is closed, there's nothing to protect. But the reason that you should look at the IPO as the inception of a SPAC is because the very definition of SPAC is a public company that seeks a target to merge with. And say the IPO had failed, there never was a public company and there never was any entity meeting the definition of a SPAC. So I would say if you look at those two things together, you look at the purpose of 702B, which was to protect the first deal, you look at the fact that it is post-business combination and then pre-IPO, none of those services. That seems to bridge pretty far because I would read 702B as being basically, as you say, to protect the deal, meaning we don't want people being distracted. We've got a project here and we don't want people working on a different project. And indeed, that seems to be the interpretation that the parties had because that's what concerns the exclude carve-out for Mr. Boris's things that he's already working on. And I don't know what stage those things were at, but my impression here is you're supposed to be devoting all your efforts to this except Boris gets a grandfathered exception because he's already working on something else. That's true that Mr. Boris was working on that. I believe that was already a post-IPO deal. So it was already a SPAC. I don't think you need this one. No, we don't need this one. You're exactly right. And another reason we don't need this one is because post-business combination, there were no possible damages to Mr. Boris from these purported services. And the reason for that is Mr. Boris said the whole point was to have full commitment to the SPAC we were doing, FMC1. It's already done and dusted. The business combination has occurred. The district court said, well, look, no damages from any kind of activity after that were foreseeable. But also, the breach literally couldn't have harmed Mr. Vogel. Mr. Vogel admits over and over that there was no deal to do future SPACs. So what possible good could it do him if Mr. Keeve and Mr. Boris forbore from some of these preliminary activities for a month or two? They could do it anyway. Well, can you point to the provision? I was surprised, and I'm sitting here going through the operating room trying to find my notes here. But I thought that under the actions by managers under 6.02 that forming a second SPAC was among the things that required unanimous consent. I'm not quickly finding it. Am I wrong? I think it's section 2.04 in the first instance that says what is the purpose of this. Yes. And the purpose of it is to do this deal. Right. SPAC number one. And then 6.02C, little rum and five. It says you can't change it. It says you can't change that initial purpose without the unanimous vote of a meeting or unanimous consent of the managers. That's the two-step, right? Section 2.04 says the initial purpose is to do this deal.  And section 6.02C, little rum and five. Yes. The parties were prohibited from changing the business of the company from the initial purpose without the unanimous affirmative vote at a meeting or prior written consent of all the managers. Right. Isn't that the part that we read as saying they can't decide collectively, they're not collectively required to do a second deal until they all agree? Actually, there's a much clearer provision, which is 11.01C, which says that's the dissolution provision, which says that a foreign management company will automatically dissolve upon the dissolution of a sponsor unless unanimously agreed by the parties. So that's crystal clear that this was not a forever deal, and it needed affirmative consent of both parties to do it.  Okay, we're good? All right. Thank you, Your Honor. Appreciate it. Mr. Silvestri. Thank you, Your Honor. I'd like to begin by addressing where we left off about the timing of engaging either direct or indirect services. And I want to point, Your Honors, to Joint Appendix 713, which is deposition excerpts from Mr. Boris, which are the deposition experts that back up the paragraphs 134 through 140 of our Undisputed Material Facts. And I asked Mr. Boris, when you three decided to go into business together, you eventually formed the sponsor a few months after that. Do you recall the timeline being the same? In other words, was it a few months after you agreed to do FMC2 with Mr. Keeve that you formed the sponsor? Mr. Hockman objected. The witness then answered, I don't recall. I think it was. I think it was less than a few months, but I don't recall. Recognizing the fact that Mr. Boris said he didn't exactly recall, it being less than a few months later is in keeping with the timeline in the rest of the record. It was pointed out during the questioning of Mr. Hockman that the second sponsor for FMC2, or rather the draft operating agreement for FMC2, was sent to them by their lawyer sometime in April. Well, that doesn't appear on the thin air. Right. I'm interested that we're now sort of delving behind. You had your Rule 56 statement where you stated all the facts, and that's what I'd been relying on. And the earliest date where you identify something that looks like a service is April 14th date, where they sent a draft executive summary and it says, please review carefully. So now what you're saying is, well, it's not in your Rule 56 statement, but if you look behind at the Boris deposition, there's some acknowledgment that at some time before that the conversations with counsel started, and we don't have a date, we have kind of a concept of months. Is that a fair summary? I think that's a fair summary, and I can provide some helpful context to you, Your Honor, perhaps as an explanation. Why, I mean, I'd like to, before you do that, go and address Mr. Hochman's other point, which is sort of why would consulting counsel, if that is some kind of service, be a material breach? It seems rather trivial. We're in the wind-up phase of all of this. How would your client be damaged by that happening? We view the material breach as cutting Mr. Vogel out of his business. We view it fundamentally differently than simply – Yeah, but see, that's very different now. Now you're going back to the whole idea that this was a more expansive business in the first place. Yes. And that's a little different than saying even if we accept their interpretation of the agreement, there's a breach. That's your interpretation of the agreement, that this was intended to go on, and so this is the first step in cutting him out of the next project. But if that's not the right interpretation of the agreement, I thought your argument, your fallback argument, or maybe your first argument in your brief, is they breached even if we accept their interpretation. And I'm saying if we accept their interpretation that this was supposed to be a one-shot only deal, then why would it be a material breach of the services provision when deal one is already pretty much over? To start looking ahead to another deal that doesn't involve Vogel. Just as, by the way, he persistently did other deals and tried to get Keeve to go in with him on other deals and cut out Boris. But put that aside and explain to me why it's a material breach to start talking together, maybe even talking with a lawyer about getting started on a second project. Okay. So to back it up to Your Honor's initial point, because I think that's where the distinction is, you said how does it comport with your idea that even if we accept their agreement, they still breached before. What I was talking about, perhaps I should have been more precise, but what I was talking about is in terms of their interpretation of when the agreement terminated, not accepting everything they say about the deal in terms of the extrinsic evidence. The second layer to my response to your question,